UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SHELBY CAMPBELL,
Plaintiff,

v.

FEDERAL ELECTION COMMISSION;

UNITED STATES OF AMERICA,
Defendants.

Case: 2:26−cv−10849
Assigned To : Michelson, Laurie J.
Referral Judge: Altman, Kimberly G.
Assign. Date : 3/12/2026
Description: CMP CAMPBELL v
FEDERAL ELECTION
COMMISSION ET AL (JP)

_____

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

INTRODUCTION:

1. Plaintiff Shelby Campbell is a candidate for the United States House of Representatives in Michigan's 13th Congressional District. Plaintiff brings this action to challenge structural inequalities embedded within the political and economic systems that continue to shape participation in American democracy.

2. The modern campaign finance system operates within economic structures that were historically closed to women and many people of color. These historical exclusions from property ownership, professional participation, and financial independence created long-term disparities in wealth accumulation and political influence.

1

3. As early as 1875, the United States Supreme Court affirmed legal doctrines reinforcing these barriers. In *Minor* v. *Happersett*, 88 U.S. (21 Wall.) 162 (1875) the Court held that citizenship alone did not grant women the right to vote, confirming that women could be excluded from the political process despite their status as citizens.

4. Around the same period, the Supreme Court upheld the exclusion of women from the legal profession in *Bradwell* v. *Illinois,* 83 U.S. (16 Wall.) 130 (1873). The Court reasoned that women's "natural and proper timidity and delicacy" justified their exclusion from certain professions. *Id.* At 141 (Bradley, J., concurring).

5. These legal barriers were not isolated incidents but part of a broader legal and economic framework that restricted women's access to property ownership, professions, credit, and political participation. At the time these decisions were issued, women constituted approximately one-half of the nation's population yet were excluded from many of the institutions through which wealth and political influence were developed.

6. It was not until the ratification of the Nineteenth Amendment in 1920 that many women were formally granted the right to vote. However, millions of women–particularly Black women in the South and other women of color– remained effectively disenfranchised through poll taxes, literacy tests, intimidation,

and other discriminatory practices until the enactment and enforcement of the Voting Rights Act of 1965.

7. These historical exclusions created disparities in wealth, professional opportunity, and political influence that continue to shape modern political participation. The campaign finance structure governing federal elections operates within this historical framework.

8. Plaintiff brings this action to demonstrate how federal campaign finance laws and regulatory structures interact with this history of exclusion, producing systemic barriers to equal political participation.

## 1. JURISDICTION AND VENUE

9. This action arises under the Constitution and laws of the United States.

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which grants federal district courts jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States.

11. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3), which provides jurisdiction over civil actions brought to redress the deprivation of constitutional rights under color of federal law.

12. Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202.

13. Plaintiff challenges the constitutionality and operation of federal campaign finance laws and their enforcement by the Federal Election Commission.

3

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the events giving rise to this action occurred within this judicial district and Plaintiff resides and is a candidate for federal office within this district.

## 2. PARTIES

15. Plaintiff Shelby Campbell is a citizen of the United States and a candidate for the United States House of Representatives in Michigan's 13th Congressional District.

16. Plaintiff is participating in the federal electoral process and is directly affected by the regulatory structure governing campaign finance, fundraising, and political participation.

17. Defendant Federal Election Commission ("FEC") is an independent regulatory agency of the United States government responsible for administering and enforcing federal campaign finance laws.

18. The FEC is charged with implementing and enforcing the provisions of the Federal Election Campaign Act ("FECA") and related statutes governing federal elections.

19. Defendant United States of America is responsible for the enactment and enforcement of federal laws that regulate campaign finance and political participation.

## 3. STATEMENT OF FACTS

### I. Historical Exclusion of Women from Political Participation

20. Throughout most of United States history, women were legally excluded from full participation in political and civic life.

21. In *Bradwell* v. *Illinois*, 83 U.S. (16 Wall.) 130 (1873), the United States Supreme Court upheld a state law preventing women from practicing law, reinforcing the legal doctrine that women could be excluded from professional and civic institutions. In explaining the rationale for such exclusions, the Court stated that "the paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother," reflecting the prevailing legal view that women were primarily confined to domestic roles rather than participation in professional or civic life. *Id.* At 141 (Bradley, J., concurring).

22. Shortly thereafter, the Supreme Court held in *Minor* v. *Happersett,* 88 U.S. 21 (Wall.) 162 (1875), that citizenship alone did not grant women the right to vote. The Court explained that "the Constitution of the United States does not confer the right of suffrage upon anyone," affirming that states could deny women the franchise despite their status as citizens. *Id.* At 178.

23. These decisions reflected a broader legal framework that limited women's participation in political, professional, and economic systems. At the time these restrictions were enforced, women constituted approximately one-half of

5

the population of the United States yet were excluded from many of the institutions through which political influence and wealth were accumulated.

24. Decades later, the Supreme Court acknowledged the Nation's long history of legal discrimination against women. In *Frontiero* v. *Richardson,* 411 U.S. 677, 684-86 (1973), the Court observed that "our nation has had a long and unfortunate history of sex discrimination." The Court further noted that, throughout much of the nineteenth century, women were excluded from many civil institutions and legal rights, explaining that women historically "could not hold office, serve on juries, or bring suit in their own names," and that married women were often denied the legal capacity to hold or convey property. *Id.* 685. The Court observed that these restrictions left women a legal position that in many respects resembled that of Black individuals under pre-Civil War legal regimes, illustrating the deeply entrenched nature of these exclusions.

## II. Expansion of Voting Rights

25. Women did not obtain a constitutional guarantee of voting rights until the ratification of the Nineteenth Amendment in 1920. Even after ratification of the Nineteenth Amendment, many women—particularly women of color—continued to face barriers to voting through discriminatory practices including poll taxes, literacy tests, and other forms of voter suppression.

6

26. These barriers persisted until the enactment of the Voting Rights Act of 1965, which prohibited many forms of racial discrimination in voting.

27. The expansion of voting rights through these reforms reflected a broader constitutional recognition that participation in democratic governance is fundamental. As the Supreme Court later recognized in *Reynolds* v. *Sims*, 377 U.S. 533, 561-62 (1964) "the right of suffrage is a fundamental matter in a free and democratic society." The Constitution protects not only the formal right to vote but also meaningful participation in the democratic process through political advocacy and candidacy.

### III. Historical Economic Barriers Affecting Women

28. In addition to political exclusion, women were historically restricted from participating fully in economic life, facing legal barriers to owning property independently, entering certain professions, and obtaining financial credit.

29. These restrictions limited women's ability to accumulate wealth and establish economic networks comparable to those historically available to men.

30. It was not until the enactment of the Equal Credit Opportunity Act in 1974 that women were explicitly protected from discrimination in credit and lending decisions.

31. As a result of these historical restrictions, disparities in wealth accumulation and financial networks developed over time.

**IV. Campaign Finance and Political Participation**

32. Federal elections in the United States rely heavily on financial resources for campaign activities, including voter outreach, advertising, staffing, and ballot access efforts.

33. The modern regulatory structure governing federal campaign finance was largely established through the enactment of FECA of 1971 and subsequent amendments adopted in 1974, which created disclosure requirements, contribution limits, and the Federal Election Commission, the agency responsible for administering and enforcing federal campaign finance regulations.

34. Candidates seeking federal office must operate within this regulatory framework, which structures how campaigns raise and spend funds.

35. The financial demands of modern political campaigns require candidates to access fundraising networks and donor bases that often reflect longstanding economic structures.

36. The FECA was enacted during a period when nationwide voting protections had only recently been strengthened through the Voting Rights Act of 1965 and when women were still confronting significant barriers to equal participation in financial systems.

## V. Plaintiff's Participation in the Federal Electoral Process

37. Plaintiff Shelby Campbell is a candidate for the United States House of Representatives in Michigan's 13th Congressional District and resides within the district in which she seeks election.

38. As a candidate for federal office, Plaintiff is subject to the campaign finance regulatory framework established under the FECA and enforced by the Federal Election Commission.

39. Plaintiff must raise funds, report contributions, and conduct campaign activities in compliance with these federal regulations.

40. The financial structure of the federal campaign finance system directly affects Plaintiff's ability to compete for elected office and participate fully in the federal electoral process. Plaintiff has also engaged directly in ballot access and campaign outreach activities, including collecting petition signatures required for ballot access.

41. Plaintiff has personally invested substantial financial resources into her campaign, including liquidating retirement savings and funding campaign infrastructure such as voter data access, digital outreach tools, campaign merchandise, and operational expenses necessary to participate in the federal electoral process. Candidates with access to established donor networks are able to raise substantial campaign funds through contributions and institutional

9

support, while candidates without such access must rely heavily on personal financial resources in order to participate in the federal electoral process.

42. Plaintiff has incurred significant personal financial expenditures in order to participate in the federal electoral process. These expenditures include, among other things, the liquidation of retirement savings to fund campaign operations, payments for voter data access necessary for campaign outreach, website development, and digital campaign infrastructure, subscriptions to campaign voter-contact platforms, and the purchase of campaign materials and merchandise.

43. Plaintiff has suffered and continues to suffer concrete injury as a candidate for federal office because the campaign finance framework challenged herein affects Plaintiff's ability to raise funds, communicate with voters, and compete effectively in the electoral process. Plaintiff must compete within a fundraising environment shaped by longstanding donor networks historically less accessible to women candidates.

44. For much of congressional history, women's entry into federal office was frequently mediated through male political networks—for example, a significant number of women initially entered Congress by succeeding their deceased husbands—illustrating how access to political power and institutional support historically developed through relationships that often excluded women from equal participation.

45.  These injuries are directly traceable to the regulatory structure administered and enforced by Defendants and would be redressed by declaratory and injunctive relief from this Court.

## VI. Modern Disparities in Political Representation and Fundraising

46. Women constitute approximately one-half of the population of the United States yet remain significantly underrepresented in federal elected office.

47. Although women gained the constitutional right to vote in 1920, disparities in political representation have persisted across federal institutions.

48. As of recent congressional sessions, women hold fewer than one-third of the seats in the United States Congress.

49. Contemporary campaign finance data demonstrates that women candidates raise significantly less campaign funding on average than male candidates and receive a smaller share of large-dollar contributions from established donor networks historically associated with political and economic institutions.

50. For much of the twentieth century, women were almost entirely excluded from federal elected office. Although women represented approximately half of the United States population, fewer than five percent of members of Congress were women until the early 1990s.

51. Access to established donor networks and fundraising infrastructure plays a significant role in determining the viability of federal political campaigns.

52. Donor networks and political fundraising structures often reflect longstanding professional, economic, and institutional relationships that developed over time within existing economic systems.

53. Because women were historically excluded from many professional, financial, and institutional systems, disparities in access to wealth, capital, and donor networks continue to affect participation in modern political campaigns.

54. These disparities influence the ability of candidates to raise funds and compete effectively within the campaign finance framework governing federal elections.

55. Historical patterns of exclusion form part of the structural environment in which modern federal campaign finance regulations operate.

## VII. Relationship Between Historical Exclusion and the Modern Campaign Finance System

56. Federal election law regulates how candidates raise and spend money in connection with campaigns for federal office.

57. These laws are administered and enforced by the Federal Election Commission pursuant to the FECA.

58. The campaign finance system governing federal elections structures political participation around the ability to raise and expend financial resources.

59. Because access to wealth and donor networks developed during periods when women were legally excluded from many economic and political institutions,

these historical inequalities continue to shape the resources available to candidates participating in federal elections.

60. As a result, the modern campaign finance system operates within economic and institutional structures that were formed during periods of significant legal exclusion, thereby producing continuing disparities in political participation.

61. Even when women entered Congress, many did so through marital connections to male politicians. Approximately forty-five women in congressional history initially obtained their seats by succeeding their deceased husbands, illustrating how women's access to political power was historically mediated through their relationship to men rather than equal opportunity to compete for office.

62. Plaintiff challenges the interaction between these historical inequalities and the federal campaign finance regulatory framework, which together produce systemic disparities in political participation.

63. The facts described above demonstrate the historical and structural context in which federal campaign finance laws operate and provide the foundation for Plaintiff's constitutional claims.

## 4. CAUSES OF ACTION

### a. COUNT I
**Violation of the Equal Protection Component of the Fifth Amendment**
(Structural Political Participation Inequality)

64. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

65. The Due Process Clause of the Fifth Amendment contains an equal protection component that prohibits the federal government from denying equal protection of the laws.

66. Defendants administer and enforce the federal campaign finance regulatory framework established by the FECA, including the regulation of campaign fundraising, expenditures, and reporting requirements applicable to candidates for federal office.

67. Federal elections in the United States operate within a campaign finance system in which the ability to raise and expend financial resources plays a central role in determining a candidate's viability and ability to communicate with voters.

68. In *Buckley* v. *Valeo,* 424 U.S. 1 (1976), the Supreme Court recognized that the expenditure of money for political advocacy constitutes protected political expression under the First Amendment and that campaign spending is a primary means through which candidates communicate political ideas to the electorate.

69. As a result of this constitutional doctrine, individuals and institutions with greater financial resources are able to exercise substantially greater influence within the political process through campaign expenditures and independent political spending.

70. The distribution of wealth, professional networks, and political donor relationships in the United States developed within legal and economic systems that historically excluded women from full participation in political, professional, and financial institutions.

71. These historical exclusions included legal doctrines recognized in cases such as *Bradwell* v. *Illinois,* 83 U.S. 130 (1873), which upheld the exclusion of women from the legal profession, and *Minor* v. *Happersett,* 88 U.S. 162 (1875), which held that citizenship did not guarantee women the right to vote.

72. For the majority of United States history, women were denied access to professional advancement, property ownership rights, independent credit access, and participation in political institutions through which wealth and political influence were accumulated.

73. Although formal legal barriers to participation were later removed through constitutional amendments and civil rights legislation, the economic and institutional consequences of these exclusions persisted.

74. Where a regulatory framework operates within historically exclusionary systems and predictably perpetuates structural disparities in political

15

participation, the Equal Protection Clause prohibits the government from maintaining such a framework when it conditions effective participation in the democratic process on unequal access to economic and institutional resources.

75. The Supreme Court has long recognized that meaningful participation in the political process occupies a fundamental place in constitutional democracy. In *Reynolds* v. *Sims*, 377 U.S. 533, 561-62 (1964), the Court explained that "the right of suffrage is a fundamental matter in a free and democratic society." The Court has further recognized that wealth-based barriers to participation in elections are constitutionally suspect. *Harper* v. *Virginia Board of Elections,* 383 U.S. 633 (1966).

76. Because modern federal campaigns rely heavily on financial resources, and fundraising networks that developed during periods of historical exclusion, the campaign finance system operates within structural inequalities created by historical exclusion and continues to perpetuate them. These inequalities disadvantage women candidates and similarly situated individuals by limiting access to donor networks, capital resources, and other mechanisms necessary to compete effectively in federal elections.

77. Plaintiff is a candidate for the United States House of Representatives and is subject to the campaign finance framework administered and enforced by Defendants.

78. In order to participate in the federal electoral process, Plaintiff must raise funds, access donor networks, and compete within a campaign finance system that structurally privileges candidates with access to established financial and institutional resources.

79. The interaction between historical exclusion from economic and political institutions and the modern campaign finance regime produces predictable and continuing disparities in political participation and electoral viability.

80. By enforcing and maintaining a campaign finance system that conditions effective political participation on access to financial resources and donor networks that developed during periods of legally sanctioned exclusion, Defendants maintain a regulatory structure that denies Plaintiff and similarly situated individuals equal protection of the laws.

81. Defendants' actions therefore violate the equal protection component of the Fifth Amendment to the United States Constitution.

### b. COUNT II
### Violation of the First Amendment
### Political Speech and Meaningful Political Participation

82. Plaintiff incorporates by reference all preceding paragraphs of this Complaint fully set forth herein.

83. The First Amendment of the United States Constitution protects freedom of speech and participation in the democratic political process.

84. Political advocacy, participation in elections, and communication with voters constitutes core forms of protected speech under the First Amendment.

85. Federal campaign finance laws regulate how candidates and individuals may raise and expend funds in connection with federal elections and are administered and enforced by Defendants pursuant to the FECA.

86. Modern federal campaigns require substantial financial resources in order to communicate with voters through advertising, voter outreach, campaign staffing, and other campaign activities.

87. In *Buckley* v. *Valeo,* 424 U.S. 1 (1976), the Supreme Court recognized that expenditures of money in connection with political campaigns enable political speech and facilitate communication with voters. The Supreme Court has recognized that the ability to spend money in elections is a primary mechanism through which candidates disseminate political messages and communicate with voters.

88. The Court later reaffirmed and expanded this principle in *Citizens United* v. *Federal Election Commission,* 558 U.S. 310 (2010), holding that independent political expenditures constitute protected speech under the First Amendment.

89. As a result of this constitutional doctrine, individuals and institutions with greater financial resources are able to exercise substantially greater influence within the political process through political spending and independent expenditures.

18

90. Because the dissemination of political messages requires financial resources, disparities in access to fundraising networks and capital directly affect a candidate's ability to engage in political speech and communicate with the electorate.

91. The distribution of wealth, donor networks, and political fundraising infrastructure developed within economic and institutional systems that historically excluded women from full participation in political and professional life.

92. These historical conditions continue to influence the resources available to candidates participating in federal elections.

93. As a result, the modern campaign finance system permits individuals and institutions with greater financial resources and access to established donor networks to exercise substantially greater influence within the political process.

94. Plaintiff is a candidate for federal office and must operate within this campaign finance framework in order to communicate with voters and participate in the electoral process.

95. Because effective political advocacy in modern elections requires financial resources, disparities in access to fundraising networks and capital restrict Plaintiff's ability to disseminate political messages, communicate with voters, and compete on equal terms in the federal electoral process.

96. By enforcing a campaign finance framework that conditions meaningful political participation on access to financial resources and donor networks shaped by historical exclusion, Defendants impose structural burdens on Plaintiff's ability to engage in protected political speech.

97. Defendants' enforcement of this regulatory framework therefore infringes upon Plaintiff's First Amendment rights to political speech and meaningful participation in the electoral process.

### c. COUNT III

### Declaratory and Injunctive Relief
### (28 U.S.C. §§ 2201–2202)

98. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

99. An actual and justiciable controversy exists between Plaintiff and Defendants regarding the constitutionality of the federal campaign finance regulatory framework described above.

100. Plaintiff is a candidate for federal office and is currently subject to the regulatory framework administered and enforced by Defendants pursuant to the FECA.

101. Defendants' continued enforcement of this framework causes ongoing harm to Plaintiff by burdening Plaintiff's ability to participate in the federal electoral process on equal terms.

20

102. Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and legal relations of the parties with respect to the constitutional questions presented in this action.

103. Pursuant to 28 U.S.C. § 2202, this Court may grant further necessary or proper relief based upon such declaratory judgment, including appropriate injunctive relief.

104. Plaintiff therefore seeks declaratory and injunctive relief preventing Defendants from enforcing the challenged regulatory framework in a manner that violates the First and Fifth Amendments.

## 5. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the federal campaign finance framework described herein violates the First Amendment to the United States Constitution;

B. Declare that the federal campaign finance framework described herein violates the equal protection component of the Fifth Amendment to the United States Constitution;

C. Enter appropriate declaratory and injunctive relief preventing Defendants from enforcing the challenged regulatory framework in a manner that violates Plaintiff's constitutional rights;

D. Award Plaintiff costs and any other relief this Court deems just and proper.

Respectfully Submitted,

Shelby Campbell- Pro Se
1420 Washington Blvd Suite 301
Detroit, MI 48226
313-909-3152
Shelbysoup@gmail.com

22

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Shelby Campbell

**DEFENDANTS**
United States of America;
Federal Election Commission ☐+

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se
1420 Washington Blvd. Suite 301 ☐+

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☒ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☒ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
_____

Brief description of cause:
First and Fifth Amendment constitutional challenge to the federal campaign finance regulatory framework administered by the Federal Election Com ☐+

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $ _____
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 3/12/2026
SIGNATURE OF ATTORNEY OF RECORD
Pro Se *(signature)*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____